The next and final argument is Appeal 1565 from 2009, Rothy Development v. Department of Defense. Good morning to you, Mr. Barton, welcome back, if I've got the count right this is your fourth visit to our court? Yes, sir. Alright, this time we're just talking about fees, not constitutionality, so please proceed. It's all been fun, I can assure you. What this case can be boiled down to, and this is what I anticipate a little bit, that we're going to talk about the Syntex case in American Hospital, Judge Greisen's decision, and what constitutes the necessity to award fees, and this case falls into a case where a mandatory award is warranted. All things flow from two or three points in this case. First of all, the defendants were never substantially justified in their defense, because the real summary of their argument is, how can there be a lack of substantial justification, Congress enacts a statute, the President signs it, so why doesn't the executive branch, why isn't the Justice Department substantially justified in defending a statute enacted by Congress? That's not what the case law is, even on a constitutional claim. Even in a constitutional claim, DOJ has an obligation to evaluate whether they have a reasonable chance to succeed. In this case, they had no reasonable chance to succeed. Well, they succeeded several times in the district court, so the history of the case doesn't support the idea that they never had any chance of succeeding. Well, we would certainly disagree with anything that the district court did in this case. This court found the district court clearly erroneous at the end, and what that did, that established that they were just completely wrong in their evaluation of both the facts and the law. And the biggest problem here, the biggest problem that I even have personally, is with the fact that they ignored the law that was established primarily through Croson and then Adaran in 1995, and to come forward in 1998 and say, and for the government to say that they had sufficient statistics to establish that there was a sufficient disparity that would raise to the level of discrimination. This is a two-, three-step process. Croson said you had to have those statistics. The government never had those statistics, and in fact, the really telling factor in this case is that in 1998, 1996 to 1998, following the Adaran case, when it made clear that the Croson standard applied to federal statutes also, the government started putting together the benchmark study, which was to be their statistical evaluation to show a disparity that would raise to the level of at least giving an inference of discrimination. They did that. They should have redone it. They tried to do it. It was never adjudicated in this case, because by the time we finally got to a decision in this case, that study had become stale. Why had it become stale? Because the government didn't even make the effort to go forward. Would you agree with the proposition that if the Justice Department has substantial factual and legal support for its position to defend the constitutionality of a statute, then the Justice Department's defense is substantially justified? It has to have reasonable factual basis, reasonable legal basis. I would agree with that. Okay. Now, in this case, as I recall, when we overruled the district judge, we emphasized that Croson required a strong showing in evidence, and in assessing the various studies presented to the Congress that they relied on for the enactment and the reenactment of this provision, we said it just didn't meet that high hurdle of a strong showing. It was some showing, but it was, I'll call it a weak showing versus a strong showing. Now, that's a matter of degree. It seems to me that the Justice Department would be justified in defending the constitutionality of a statute that's supported by substantial evidence, even if a court later, as we did, says it didn't quite get to the level of a strong showing. How do you get around that? They have to be reasonable in their assessment, and it was pointed out numerous times in this case that you needed relevant and applicable disparity studies. The disparity studies that they finally came up with in the end, and the court really never did get to this issue because it didn't have to at that point, it rejected the methodology of those studies, and you could even go ahead, as the court did, and say that maybe these studies indicate that there may be some discrimination somewhere by someone against someone. However, that had no connection to DOD, and this program was set up for DODs, and the government knew how to solve that problem in 1996 following Adirond. That's when they got started on the benchmark study, but they let that fall by the wayside, and they essentially had no case at that point. You're asking us then to treat the studies as really irrelevant, as if they didn't exist. They were so bad, so irrelevant, so flawed methodologically, etc., that they really just don't count as studies at all, so that in that view of the evidence, the government had no studies to rely on. That seems like an awfully exaggerated position. There were flaws found in the studies, but I don't think we ever said that the studies just didn't count. They were so bad that it's as if they had never been done. It's a matter of degree, isn't it? But we didn't get to that point. The methodology, whether they were real, flawed, or whatever, really doesn't make any difference, because you didn't have to get to that next point where you evaluate whether there was any relevance between those studies and a program set up by the federal government to resolve discrimination that was in some way associated with the Department of Defense. Those studies had absolutely no relevance to that. As an example, when we go back in this case... Well, those studies didn't exclude the Department of Defense, as I recall. They merely included lots of other departments at the federal level and public contracting authorities also at the state and local level, so they were a big mix. But they didn't exclude the Defense Department, did they? They were part of a program that was set up by the Department of Transportation, and the Department of Transportation's rules have completely different hearings and completely different statute and completely different requirements. What's the answer to my question? Were federal defense contracts excluded from the studies? Yes. I don't think you're right about that. The disparity studies that were in question here were local disparity studies, state, city and county disparity studies that had to do with the distribution of funds, and this gets into another issue where I think we'll go, but I'll try to in my answer, where it was a distribution of funds by these local agencies that really didn't even have anything to do with the Department of Transportation. The Department of Transportation merely said, you need to justify that there's no discrimination in your business in order to properly be getting our money for federal highway funds. So the money, yes, comes from the Department of Transportation, but the disparity studies really have nothing to do with it, and that's one aspect of the Department of Transportation program that might be able to survive constitutional scrutiny, and has in a few instances. Some of those I would disagree with. Well, the constitutional issue is settled in this case. The only important issue that I can see is whether the government had a reasonable basis to defend the statute or not. You say it didn't. The government says it did. We have to decide who's right. Well, I keep going back to the benchmark study because it provides such a good example. In 1998, the reason the government did that benchmark study, the only reason it could be surmised, because it was really hard, no way to tell what their purpose was, they stated in some of the briefs that the purpose was to provide the basis to show that there were disparities and discrimination. So the issue becomes at that point, well, if they thought they were getting better in the federal contracts, if they knew they were getting better at that point and they let the benchmarks fall and go stale and didn't renew them, then obviously they were getting worse by 1996 to have to go reach out and bring in some local studies to show disparity in local areas that doesn't go to a national indicator of whether there are disparities nationally. So are you saying that only a federal defense contract benchmark study would have been sufficient to justify the government in defending the statute? I would make that argument, but we don't have law that establishes that right now. Arguments have gone on in this case over the period of time, well, how many disparity studies that were done in different places in the United States could maybe give a national indicator of whether there's disparity or discrimination nationally? The Urban Institute did a study in, I think it was 2001, that evaluated, they took in 96 studies from all over the United States, same kind of the six that were put up by the government in the end, and they picked 58 of those that they thought were methodologically sound. Even after they evaluated those and found some disparities, they said 56 studies doesn't give a national indicator of whether there are disparities nationally, and we can't tell by these even if there's disparities raised to the level of discrimination. So how can the government go back at any time here after they let go of their own focused disparity study that's designed for the specific purpose to justify this program after they determine that's necessary after Adirondack, and this has been in existence since the very beginning of this case. So you're saying then that they win just because they abandoned the benchmark study? You win because they gave up on the benchmark study, that's the only thing that could have provided justification for defending the statute? It's the only thing in this case that has any relevance to being able to support it. Maybe if they would come in with a thousand studies in jurisdictions that have some kind of a connection to DOD. Remember this statute is designed only for DOD, an agency in which the facts in this case are, even DOD said there has never been discrimination in DOD contracting from forever. They just don't have any indicators of it. Is that true or not? It certainly is what's happened, but yes, I say that if they don't have something that's focused on DOD, they aren't going to be able to do it even with a thousand different studies because they don't focus on DOD. You want to save the rest of your time for rebuttal? You're down to two and a half minutes. Five minutes is what I reserved. You're down to two and a half. Maybe it's time to stop. Oh, I thought you were continuing me over. I would have stopped. Thank you. This will be enough I think. Good. Thank you, Mr. Barton. Mr. Dugan. Please, the Court. Connor Dugan for the United States, Your Honor. The issue in this case is whether the government's position was substantially justified. It was. Mr. Barton doesn't even mention Pierce v. Underwood, which establishes the standards here, and in that case, the Supreme Court analogized to the Federal Rule of Civil Procedure 37A4 and said the question there is whether or not, it's not whether or not it's justified to a high degree, but whether or not there's a genuine dispute, whether or not reasonable people could disagree. And I think the questions that Your Honors were asking were pointing right at that genuine dispute that existed from the beginning. The government here was defending the constitutionality of the congressional statute, the duty it has. Furthermore, as Your Honor, Judge Mischel. Well, wait a minute. When you say it has a duty, are you saying that there is no circumstance in which the government, reasonably and properly, declined to defend the constitutionality of the statute? There's no case in which the government would be authorized to confess error and agree that a statute passed by the Congress violated the constitution? No, that's not what I'm saying, Your Honor. Then what are you saying? Well, I'm saying that the Department of Justice has to go through that same analysis, look at strict scrutiny, see if there is a strong basis of evidence. And in this case, there's a genuine dispute. Obviously, Your Honor, found differently, but noted that the district court here had a thorough opinion, over 100 pages looking at the six disparity studies, looking at the SBA reports. But you really aren't responding to Mr. Barton's argument. As I understand his argument, he's saying, in the end, they only had six studies to justify the statute. The six studies were totally local, they had nothing to do with the Federal Department of Defense. They weren't even relevant and they were flawed, and therefore, they were entitled to essentially no weight. Well, we would disagree with that assessment of those studies, and I think this court even noted. Well, what is the power and relevance of those studies if they don't deal with the Defense Department, and the Defense Department is the only department covered by the statute we're arguing about? Well, I disagree with Mr. Barton's assessment of those disparity studies. I mean, as the district court laid it out in that 100-page opinion, these studies dealt with things like contracting professional services. I don't think that they were split out into specific industries and excluded the Department of Defense. He didn't say that it excluded specific industries. He said it focused on local and state contracts in six different areas, and therefore, didn't tell anybody anything about U.S. Defense Department contracts. What's your response to that? Well, the response, I think, to that is this, that those disparity studies are a sampling of the sort of contracting that goes around throughout the whole nation. Congress was justified in relying on those as evidence of the sort of discrimination that goes on in contracting. But don't you agree that the issue is Defense Department contracting, not state or local contracting? It is. The issue is Defense Department contracting, but it's not to say that those studies can't lead to an inference of the sort of contracting that's going on. Why would it be logical to assume that the Defense Department historically is discriminated on a racial basis because the highway department in Colorado, let's say, was shown to have discriminated? Why would there be any connection? Why wouldn't it be equally likely that the Defense Department never discriminated, even though the Colorado Highway Department did? Well, I would point you to the language you use in the opinion. I mean, it's a different government. You can't assume that because one level of government does something wrong, that every other level of government also is doing the same thing wrong. No, I understand, Your Honor. But what you wrote in the 2008 opinion is this, and given the amount of money spent by DOD, it is likely that some money injected by DOD into the nationwide contract market has made its way into the hands of contractors, subcontractors, or sub-subcontractors who engage in discrimination. That's a reasonable inference to make from these disparity studies. So that's what I would point, Your Honor, to, that because these studies are six studies that spread across the nation, that they can lead to that inference, and it certainly was the genuine dispute that Pierce points this court to as being enough for a substantial basis for the government's position. Just out of curiosity, as a matter of substantive constitutional law, do you think that if the evidence clearly showed widespread discrimination in, let's say, state and local contracting, and no discrimination in federal contracting, that the federal government could adopt a way to compensate for the discrimination in other settings? In local settings? Yeah. And you're saying that the studies themselves show that there's no discrimination going on? In the federal system, right. Well, that's not the question here. Well, it's not too far from, go ahead, what would your take on that be? I would say that it would depend on sort of the level of discrimination in those localities, and to the extent that there's some sort of nexus between the federal contracting and the local contracting. But again, obviously, that's not the question in front of court here. Well, what do you mean if there were some nexus? I don't understand what you're saying. By that, I mean, again, the sort of inference that this court was suggesting was possible from those studies. I'm leaving out the nexus. You're saying that the nexus is clearly not there. Right. Well, I'm not sure that the government would have, would meet strict scrutiny in that case. But again, that's not the case here. What do you think is, could you articulate the standard, maybe with a little more precision if it's possible to do so, for what the government's responsibility is, consistent with not violating the standard of EJA, when it is faced with the question of whether to give up on the constitutionality of a federal statute that has been challenged? Can I use this case as an example? Sure. I think we have to go through the real rigorous strict scrutiny analysis. Okay. But at the end of the day, suppose this memo is sitting on the Attorney General's desk, and the Attorney General asks you, well, I think we've got a loser here. And I think we are going to lose, and personally, I think we should lose this case, because I think the wind is all in our face in this case. And you say, but under the standard that you, Mr. Attorney General, have to apply, we have to defend this, because, now finish the sentence. What's the standard given, assume with me that we all, all of you would agree that it's probably a loser, but it's not unreasonable to take positions that are ultimately unsuccessful. It isn't even unreasonable to take positions that you don't necessarily think will succeed, particularly in this setting. What is the right standard? The right standard is the standard the Court articulated in Pierce v. Underwood, and that is whether or not, it's not a high standard justified to a high degree, but justified to a degree that could easily satisfy a reasonable person. And I would argue, Mr. Attorney General, in this case, there is a genuine dispute between reasonable people. It may be a loser. When you say genuine dispute, it sounds like you're talking summary judgment law, but that's not what we have here. This is a case involving the facial unconstitutionality of a statute. So, I don't think talking about genuine disputes as if we were in the area of summary judgment really is very responsive to Judge Bryson's question. Well, it's the standard that the Supreme Court gave us in Pierce v. Underwood. That's my fallback. But at the same time, I mean, courts have found the government to be substantially justified defending statutes that are ultimately held unconstitutional by the Supreme Court. And what's the standard those inferior courts, that's distinct from the Supreme Court, follow? Well, I think they use the Pierce v. Underwood standard. Pierce doesn't tell us anything. Pierce is a totally different kind of case. You know, one bullet point out of Pierce isn't worth anything in this case. Well, I respectfully disagree, Your Honor. I think that the standard that Pierce lays out is a standard that's to be applied here. The government is substantially justified. Well, of course it is, because the Supreme Court said so. But it's so vague as to not be helpful in the context of this case. So, I'm asking you, well, what about the circuit courts who grappled with the Pierce standard in a context like this context? I would point to Gonzales, the case out of the Ninth Circuit, which we cite. And there they looked at both the dissents and the denial for reimbark hearing. They looked at the district court's findings. They looked at other courts' findings. And they said that this shows a string of successes. So then, bringing it back to this case, I would look both at the district court and the fact that we had a string of successes. And, yes, also the Department of Transportation program that was upheld in Sherbrooke, in Adirond, and in, I'm forgetting the last, Western States, Pavey. So the government had a justification looking at both, at these cases where other circuits had upheld the constitutionality of a similar program. Plus, we had the string of successes. That's the analysis. So it sounds like you're basically saying, well, we used to win in the district court in San Antonio and that's enough. Well, I'm not saying that's enough. I'm saying that we also had the cases that were the Department of Transportation. Different program. It is a different program. How does that help you here? It helps us in the sense that Congress was relying on some of the same studies. Obviously, they were more robust. They had much more probative force at the state and local level because they were state and local studies. Sure. Way less of any probative force when we're talking about one department of the federal government. Here we had six disparity studies that the district court went through thoroughly. And that's something, Your Honor, you recognized. What does the thoroughness of the district court's opinion have to do with it? Or even the number of disparity studies? You win if you have six disparity studies, but you might have lost if you'd only had four? We just count beans? No, it's not just counting beans. Then what is it? I think it goes back, and Your Honor thinks it's vague, but I don't think this idea of a genuine dispute between Muslim people is a vague concept. The fact that we had these studies to rely upon was enough for us to go forward. It certainly substantially justified our position. Furthermore, we haven't even talked about it. That's the issue in the case. You say it certainly justified our position. He says it doesn't. We have to decide. It doesn't help us for you to just repeat it substantially justifies our position. Why? Well, the other thing we haven't talked about is this court reviews it under an abusive discretion standard. We know that. But I think that that needs to be in play here because that also— It's in play here because we're bound by it. Yeah. And your last question, Your Honor, was— You say six studies. What is it about the six studies that made it an open question whether this statute was unconstitutional or not? Well, it's the six studies plus the SBA studies plus the anecdotal evidence plus the background of 20 to 30 years of Congress looking to root out discrimination in contracting. It's not just the six studies. Plus, we would say the string of successes in front of the district court. And even though Your Honor points out rightly that the DOT program is different, it's still—the government relied upon those cases to go forward with its position here because it saw that other courts were upholding a similar contracting program. And all of those things combined substantially justify the government's position. It's not just the six studies. It's all of these things together. Normally, as you know, I think it's been alluded to in this case, the solicitor general does not lightly give up on the constitutionality of a federal statute. But I take it that there was at no point a petition for certiorari in this case. There wasn't. And as we note in our brief in a footnote, the statute was about to lapse, I think, six months down the road. So that is sort of the explanation we get in our brief for why we didn't petition for cert. Do you think that, setting aside the particulars of this case, do you think that that is a factor that a court could legitimately take into account in determining whether the government's position was reasonable, that the government did not seek further review? No, Your Honor, because there's so many factors that go into that consideration. Is there a circuit split? Are there other considerations? I mean, the solicitor general goes through all those factors to make that decision. So I don't think that is a factor this court should take into account. All right. Thank you, Mr. Duggan. Mr. Barton, you have a couple minutes of rebuttal. Two and a half. Well, except right at the end where he made the comment that they didn't fight this and by cert was that it was going to go away in six months. This is a program that they persisted with for over 20 years at the time they gave it up. There was, I don't agree. It's what they say it was. I don't believe that that could have possibly been the situation in this because of the impact of this case on any other case, showing what the direct connections need to be. And they essentially say, by arguing Sherbrooke and Cortez in their briefs, again here today, that there's conflict in the circuits. Well, if there was a conflict in the circuits on this very important constitutional issue, as you say, they should have taken certiorari if they believed in their case. They obviously didn't believe in the case here. Counsel referred to something called plus SBA studies. There's not anything referred to in this record or any other record that I'm aware of regarding SBA studies. There are other local studies that are like the six that are brought up in this case that have no application to DOD. This had no application to DOD. As you all noticed clearly, Pierce, Gonzalez, both were intermediate scrutiny cases. The other cases that the government uses to support their case, League of Women Voters and Grace, those were intermediate scrutiny cases that just don't apply here. And this is what the problem's been. The government has refused to even acknowledge our arguments regarding the Urban Institute report that not even 58 studies gave a national standard for possible disparity. Yet here they come in with six, and they still don't recognize that, even though we brought it up in our briefs again. They refuse to accede to anything we try to do in this. They keep just pushing ahead in a case that was unreasonably prosecuted for a period of 10 years. Mr. Barton, what would your answer be to Judge Bryson's earlier question? If it were shown that prime and subcontractors for the Defense Department over many years had been victimized by racial discrimination at the state and local levels, would Congress have been acting constitutionally to try to remedy those long-inflicted harms, even though they weren't inflicted by the Federal Defense Department, as a way to repair the damage inflicted elsewhere, but to do so in the context of U.S. Defense Department contracts? Would that be constitutionally allowable? It would not be constitutionally allowable. And what it does, it goes in the face. And a case like that, should it come up, would address this passive participation issue that was raised in this case. And when you think about it in that context, passive participation is nothing more than societal discrimination that cannot support the strict scrutiny standard. And you aren't going to be able to get there with that kind of evidence. The thing that I will close with is even in the League of Women Voters, the more clear the statement is, the more clearly established are the governing norms and the more clearly they dictate a result in favor of the private litigant, the less justified it is for the executive to pursue or persist in litigation. And that's exactly the case we have here. We have these established norms of what will be accepted. The government has refused to accept them. They lost on a summary judgment motion, for God's sakes. That's not a high standard to win on a summary judgment motion. The evidence was clear what the outcome was going to be in this case from the beginning. And Rothy Development felt the necessity to move forward through all these ten years. All right. We thank you both. The appeal is submitted.